IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY R. FERGUSON, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 4:00CV1882 CDP |
| | ) | |
| vs. | ) | *This is a Capital Case* |
| | ) | *Execution Scheduled* |
| TROY STEELE,[1] | ) | *March 26, 2014, 12:01 a.m.* |
| | ) | |
| Respondent. | ) | |

**SUPPLEMENTAL PETITION FOR WRIT OF HABEAS CORPUS**

COMES NOW Jeffrey R. Ferguson, by and through appointed counsel, Jennifer Herndon and Michael J. Gorla, and files his Supplemental Petition for Habeas Corpus under 28 U.S.C. § 2254 raising a claim under *Napue v. Illinois*, 360 U.S. 264 (1959), that has just recently become ripe for habeas review. In support of this supplemental petition, Ferguson states as follows:

1. Jeffrey Ferguson, a state prisoner under sentence of death, originally filed his petition for writ of habeas corpus challenging his state conviction for first-degree murder, and resulting sentence of death on November 26, 2001. (Doc. 28).

2. On July 17, 2003, this Court issued its Memorandum and Order (Doc. 66), and Judgment (Doc. 67) denying habeas relief.

3. In conjunction with its Judgment, this Court issued a certificate of appealability (COA) on one issue: whether, under *Arizona v. Youngblood*, 488 U.S. 51 (1998), Ferguson was deprived of due process when the state failed to preserve

---

[1]Troy Steele is the current Superintendent of the Potosi Correctional Center, having succeeded Donald P. Roper, and his successor, Michael Bowersox.

potentially useful evidence - the surveillance videotape of the scene from which the victim was abducted. *Id.*

4.  A timely notice of appeal was filed, and the case was docketed in the United States Court of Appeals for the Eighth Circuit under Case No. 03-3252.

5.  Ferguson filed a motion in the Eighth Circuit to expand the COA seeking the right to appeal additional issues, including a *Brady*[2] claim that the state failed to disclose favorable and material impeachment evidence, specifically that FBI Agent Michael Malone, the hair and fiber analyst who testified at Ferguson's trial, previously testified falsely and outside of his area of expertise in other criminal cases. *See Ferguson v. Roper*, No. 03-3252, App. for COA, October 10, 2003.

6.  The motion to expand the COA was denied by the Eighth Circuit on November 4, 2003, and a petition for rehearing seeking *en banc* rehearing of said motion was dismissed on November 26, 2003.[3]

7.  Following briefing and oral argument, the court affirmed the district court's denial of habeas relief. *See Ferguson v. Roper*, 400 F.3d 635 (8th Cir. 2005).

8.  Ferguson then filed a petition in the United States Supreme Court seeking certiorari from the Eighth Circuit's denial of relief on the *Youngblood* and *Crawford* issues, as well as from the Eighth Circuit's refusal to expand the COA to include

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

[3] Following the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), Ferguson did obtain an additional COA on the issue of whether the admission of the non-testifying co-defendant's out-of-court statements violated his Sixth Amendment rights under *Crawford*.

Ferguson's *Brady* claim concerning Agent Malone. The petition was denied on January 9, 2006. *Id.*, *cert. denied*, 546 U.S. 1098 (2006).

9. Following the Supreme Court's denial of certiorari, Ferguson filed an original petition for a writ of habeas corpus in the United States Supreme Court under the All Writs Act, 28 U.S.C. § 1651(a), seeking relief under *Brady* from the state's failure to disclose favorable material evidence regarding Agent Malone. *In Re Jeffrey R. Ferguson*, No. 05-9420, Petition for Writ of Habeas Corpus (U.S. filed, Feb. 17, 2006). The petition was denied on April 17, 2006.

10. On or about August 29, 2013, counsel Gorla received a letter from John Crabb, Jr., Special Counsel with the United States Department of Justice, advising him that the Department of Justice reviewed the microscopic hair analysis testimony presented at Ferguson's trial. Ltr. from John Crabb, Jr., Special Counsel, U.S. Dept. of Justice, to Michael Gorla, *State v. Jeffrey Ferguson*, (Aug. 29, 2013); (Ex. 1).

11. The review was part of a cooperative project between the FBI and the DOJ and the National Association of Criminal Defense Lawyers and Innocence Project "to review thousands of criminal cases in which the FBI conducted microscopic hair analysis of crime scene evidence." *See* Norman L. Reimer, *The Hair Microscopy Review: An Historic Breakthrough for Law Enforcement and a Daunting Challenge for the Defense Bar*, The Champion (July 20, 2013); (Ex. 2). This review was prompted in part by the 2009 National Academy of Sciences report on forensic science which specifically identified microscopic hair comparison evidence as problematic. But, the "more direct triggering event was the exoneration of three men between 2009 and 2012 who had

3

served lengthy prison sentences, and whose convictions were tainted by microscopic hair comparison evidence that exceeded the limits of science." *Id.*, 1-2.

12.     Included with the August 29, 2013 letter was a copy of a letter dated August 20, 2013, written by Special Counsel Crabb, Jr. to Mr. Robert P. McCulloch, the St. Louis County Prosecuting Attorney, notifying him that the Department of Justice has determined that testimony given by Agent Michael Malone regarding microscopic hair comparison analysis in Ferguson's case "included statements that exceeded the limits of science, and were, therefore, invalid." Ltr. from John Crabb, Jr., Special Counsel, U.S. Dept. of Justice, to Robert P. McCulloch, St. Louis Prosecuting Attorney, *State v. Jeffrey Ferguson* (Aug. 20, 2013); (Ex. 3).

13.     Special Counsel Crabb's letter included a paragraph stating that " in the interest of justice," the United States would waive any statute of limitations or procedural default defenses and any post-conviction action filed under 18 U.S.C. § 2255 "in order to permit the resolution of legal claims, arising from the erroneous presentation of microscopic hair examination laboratory reports or testimony." *Id.* 2-3.

14.     Based upon the Department of Justice findings, Ferguson filed a petition for a writ habeas corpus under Mo. R. Civ. P. 91 in the Missouri Supreme Court, asserting, *inter alia*, that his first degree murder conviction violated due process under *Napue v. Illinois*, 360 U.S. 264 (1959), because it was based on the state's knowing presentation of false, misleading and exaggerated testimony. *In Re Jeffrey Ferguson v. Troy Steele*, No. SC93873, Petition for a Writ of Habeas Corpus (Mo. filed Dec. 24, 2013); (Ex. 4).

15. The Missouri Supreme Court denied Ferguson's petition by a summary order dated February 21, 2014. *Id.*, Order Denying Petition (Feb. 21, 2014); (Ex. 5).

16. With the Missouri Supreme Court's denial of Ferguson's state habeas petition, Ferguson's *Napue* claim - that his conviction is based on the state's knowing presentation of false and misleading testimony - is ripe for federal habeas review.

### *This Supplemental Petition is Not a "Second or Successive" Petition Within 28 U.S.C. § 2244(b)*

Ferguson anticipates that the state will argue that this supplemental petition is a second or successive petition for purposes of 28 U.S.C. § 2244(b), subject to dismissal because it was filed without authorization of the circuit court. But, that argument fails because the *Napue v. Illinois*[4] claim raised herein just recently became ripe for review, and thus, this supplemental petition is not a second or successive petition within the meaning of § 2244(b). The trio United States Supreme Court cases: *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998); *Panetti v. Quarterman*, 551 U.S. 930 (2007); and *Magwood v. Patterson*, 561 U.S. 320, 130 S.Ct. 2788 (2010), support this position.

Both *Martinez-Villareal* and *Panetti* involve competency to be executed claims based on *Ford v. Wainwright*, 477 U.S. 399 (1986). *Martinez-Villareal* included a *Ford* claim in his original petition; however, the claim was dismissed by the district court without prejudice as premature. After the state set an execution date, *Martinez-Villareal* sought permission from the circuit court to file a second or successive petition raising the *Ford* claim. *Id.* at 640-41. The Supreme Court held that *Martinez-Villareal* did not need

---

[4]360 U.S. 264 (1959).

to seek authorization from the circuit court to litigate his *Ford* based claim, finding that said claim was not raised in a second or successive petition for the purposes of § 2244 because "[t]here is only one application for habeas relief," *id*. at 643-44, and Martinez-Villareal's *Ford* claim was not ripe for review until the state set an execution date. *Id*. at 643-46.

Like *Martinez-Villareal*, *Panetti* also raised a *Ford* based competency claim. But, unlike *Martinez-Villareal*, he did not include his claim in his initial habeas application. *Panetti* finished an initial round of habeas relief, and then, when he received an execution date, filed another application raising his *Ford* claim. The Supreme Court held that the statutory bar of second or successive applications under § 2244 did not apply to Panetti's *Ford* claim because he brought the claim in an application filed when said claim first became ripe. *Panetti*, 551 U.S. at 947.

Ferguson's supplemental application is not a "second or successive" petition because the claim he now raises just recently ripened for review when the Missouri Supreme Court denied his state petition for habeas corpus on February 21, 2014. While the state may assert that *Martinez-Villareal* and *Panetti* are limited to *Ford* based claims, this conclusion would be unwarranted given the Supreme Court's decision in *Magwood v. Patterson*, *supra*.

Although *Magwood* involved a factual scenario not at issue here - a grant of habeas relief followed by resentencing to death, and another habeas challenge to the second judgment - the *Panetti* decision was referenced in the majority, concurring and dissenting opinions. 130 S.Ct. at 2796; *id*. at 2803 (Breyer, Stevens & Sotomayor, J.J.,

6

concurring in part and concurring in the judgment); *id*. at 2804 (Kennedy, Roberts, C.J., Ginsburg, & Alito, J.J., dissenting).  All of the justices seem to be in agreement that *Panetti* stands for the proposition that a subsequent habeas application containing a claim that the applicant had no fair opportunity to raise in his first habeas petition either because the claim was not yet ripe for review or, the alleged constitutional violation occurred after denial of the first petition, is not a "second or successive" petition under § 2244(b).  *Id*.; *see, e.g., Nooner v. Norris*, 499 F.3d 831, 834-35 (8th Cir. 2007) (Nooner's supplemental habeas application raising a claim that the state was violating his right-of-access to the courts was filed when his claim first ripened, and was not subject to the statutory bar set out in § 2244(b)); *Crouch v. Norris*, 251 F.3d 720, 723-25 (8th Cir. 2001) (Crouch's second  habeas petition raising a claim stemming from the state's refusal to grant him parole was not a "second or successive" petition under § 2244(b) because the alleged violation occurred after the denial of his first petition).

In this supplemental petition, Ferguson raises a due process claim based on *Napue v. Illinois*, 360 U.S. 264 (1959), asserting that his state conviction for first degree murder violates due process because it was obtained by the state's knowing presentation of false and misleading evidence.  This claim became ripe for federal habeas review on February 21, 2014, the date of the Missouri Supreme Court's summary order denying Ferguson's state petition for habeas corpus.  Thus, under *Martinez-Villareal*, *Panetti* and *Magwood*, Ferguson's supplemental application is not a "second or successive" application under § 2244(b), and can be filed directly in the district court.

*Claim A: Due Process Violation Under Napue v. Illinois*

A conviction based on the state's knowing presentation of false and misleading evidence violates due process. FBI Special Agent Michael Malone, a hair and fiber analyst, provided false, misleading and exaggerated testimony that linked Ferguson to the crime, and could have affected the judgment of the jury. Ferguson is entitled to habeas relief because the decision of the Missouri Supreme Court refusing to vacate his conviction involves an unreasonable application of *Mooney v. Holohan*, *Napue v. Illinois*, and *Giglio v. United States*.

A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *United States v. Agurs*, 427 U.S. 97, 103; *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue*, 360 U.S. at 271. The same result follows "when the state, although not soliciting false testimony, allows it to go uncorrected when it appears." *Id*. at 269. And the principle of *Napue* applies equally to testimony "the prosecutor knew, or should have known," to be false. *Agurs*, 427 U.S. at 103. Whether false evidence is presented as "a result of negligence or design, it is the responsibility of the prosecutor." *Giglio*, 450 U.S. at 154

*According to the Department of Justice, Special Agent Malone*
*Gave False and Misleading Testimony at Ferguson's Trial*

FBI Agent Michael Malone was the primary examiner in charge of all the evidence in Ferguson's case. He testified that a hair taken from co-defendant Kenneth Ousley's shoe was "microscopically indistinguishable" from the victim's hair; that a pubic hair taken from the victim's sock was "microscopically indistinguishable" from Ousley's pubic hair; that fibers from the carpet on the floorboard of Ferguson's Blazer

were "absolutely indistinguishable from fiber on the victim's sweater" and that said fibers contained the same unique dye found in the carpeting from Ferguson's Blazer.

Following a thorough review, the Department of Justice concluded that Malone's microscopic hair analysis testimony "exceeded the limits of science," and was "invalid." (Ex. 3, 2). The reviewers found that Agent Malone's testimony contained ten instances of inappropriate statements:  two Type I errors where Malone improperly stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others, *see* T. 1254,[5]  ln. 23-25; 1255, ln. 3-5; six Type II errors where Malone "assigned a statistical weight or probability or provided likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or awareness of the positive association that could lead the jury to believe that a valid statistical weight  can be assigned to hair association", *id*. 1231, ln. 9-13; 1243, ln. 3-11; 1244, ln. 22-25; 1246-47, ln. 20 (1246) to ln. 1 (1247); 1249, ln. 2-16; 1253-54, ln. 25 (1243) to ln. 1 (1254); and two Type III errors where Malone "cited a number of cases of hair analyses worked in the laboratory and the number of samples from different individuals that could not be distinguished from one another . . . to bolster his conclusion that a hair belonged to a specific individual." *Id*. 1239-40, ln. 22 (1239) to ln. 1 (1240)[6]; 1241, ln. 18-25; *see* Ex. 3, 6.

---

[5]The transcript of Malone's testimony at Ferguson's 1995 trial is attached as Ex. 6. This was Ferguson's second trial. His first trial, held in 1992, was reversed for instructional error. *State v. Ferguson*, 887 S.W.2d 585 (Mo. 1994). Malone gave false expert testimony at the first trial as well. Ex. 3, 5.

[6]Defense counsel's objection to this statement was sustained.

9

*The Prosecution Knew, or Should Have Known*
*of the False Nature of Agent Malone's Testimony*

On April 15, 1997, the United States Department of Justice/Office of Inspector General released a Special Report entitled *The FBI Laboratory: An Investigation Into Laboratory Practices and Alleged Misconduct and Explosive - Related and Other Cases*. In that report, the Inspector General determined that Agent Malone "falsely testified" that he had performed testing in a case involving impeachment proceedings against federal Judge Alcee Hastings, and that he had testified "inaccurately and outside his area of expertise" concerning test results. *Id.*, Part 3, Section H12, III, p. 498-511 (April, 1997). Although the Inspector General's report was not released until April, 1997, the FBI was aware of the allegations of misconduct as early as August, 1989, when FBI Agent William Tobin reported Malone's misconduct in the Hastings matter to his superiors. *Id*. FBI whistleblower, Frederick Whitehurst, also revealed Malone's malfeasance at the FBI Crime Lab back in the early 90's, when he, too, was a lab employee. Jon C. Hopwood, *Who Is Michael P. Malone?  Corrupt FBI Agent's Testimony Sent Innocent Man to Prison*, Yahoo Contributor Network (December 19, 2009).

Ferguson's trial commenced on April 16, 1995, well after Tobin and Whitehurst made their allegations of impropriety concerning Agent Malone. While the FBI may not have made the St. Louis County prosecutor aware of the allegations of alleged improprieties of Malone, the FBI's knowledge is imputed to the state. *See Giglio*, 105 U.S. at 154 (a promise of immunity made by an assistant United States attorney is attributed to the government despite his failure to inform his supervisor or associates of the promise); *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) ("the individual prosecutor

has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *Strickler v. Greene*, 527 U.S. 263, 280 (1990) (the *Brady* rule "encompasses evidence 'known only to police investigators and not to the prosecutor'.").

### *There is a Reasonable Likelihood that Malone's False Testimony May Have Affected the Verdict*

The prosecution's case against Ferguson was entirely circumstantial.  Besides the hair and fiber evidence provided by Agent Malone, the incriminating evidence consisted of:  (1) DNA evidence, (2) Ferguson's possession of, and attempt to sell, the victim's rings to Brenda Rosener, and (3) Melvin Hedrick's testimony placing Ferguson near the abduction scene at the appropriate time.  But, like the hair evidence, there were problems with the other evidence.

The state presented no statistical probabilities associated with the DNA evidence.  As a result, the DNA match meant only that Ferguson could not be excluded as the contributor of the stain on the victim's coat.  This match was essentially meaningless given the fact that the jury had no idea whether the probability of such match was 1 in 2, or 1 in 2 million, or somewhere in between.  This uncertain DNA evidence cannot be said to have rendered the hair and fiber evidence meaningless.

Likewise, neither Ferguson's possession of nor attempt to sell the victim's rings to Brenda Rosener prove him guilty of the victim's murder.  Ferguson's statement to Rosener claiming that the rings were "very hot" shows only that he is guilty of possessing stolen property, not of being involved in the murder that produced such

11

property. As with the DNA evidence, the rings cannot be said to carry such weight so as to make the hair and fiber evidence irrelevant.

The same logic applies to Mel Hedrick's testimony. Even if everything Hedrick says is true, his testimony establishes nothing more than Ferguson had the opportunity to commit the crime. It is far from given, however, that Hedrick's testimony was truthful. He was also near the abduction scene that night, and a composite drawing made by the witness to the abduction bears a striking resemblance to him. Further, Hedrick received a $16,000.00 reward for his information, and worked with the police in an attempt to get Ferguson to confess to the crime. Clearly, Ferguson would not have been convicted on Hedrick's testimony alone.

Each piece of evidence against Ferguson suffered serious defects and lacked the force necessary to secure a conviction. It is likely that Agent Malone's false microscopic hair analysis testimony, presented as the final piece of the puzzle by the state, had the effect of tying the case together for the jury.

Malone explained to the jury that his expertise consisted of examining hairs under a powerful microscope and observing whether they were similar to other hairs.

> [T]he characteristics that are going to actually enable me to tell my hair from your hair are very tiny. To see them clearly again I have got to get up in the range of 250 to 400 power. So what I am going to do is take my hair, put it on what's called high-powered research light microscope . . .
>
> When you do that, you are going to see your hair has three definite—what we call anatomical regions. You have a very thin layer here called the cuticle made up of overlapping scales. So there is characteristics we look at here.
>
> Your hair has a hollow core called medulla. So the things we can look at here are color, shape, size, whatever. Of course, the main part of your hair

> is called the cortex. . . . What we can look for in the cortex is pigment size, pigment shape, density distribution, any other characteristics we can find such as air spaces, things like that.
>
> At the FBI lab we have a policy, we have a minimum number of characteristics in the hair before we examine that hair. If it's less than that, and normally that's around 15 classes of characteristics, if it's less than that, we say the hair is no good.
>
> Most normal hairs or average hairs will have around 20 classes of these characteristics. Well, the whole key to the exam and the reason that one expert can normally separate the hairs out from different people, is that these characteristics are arranged slightly differently in most people's hairs.

T. 1238-39.

Malone testified that the procedure used by hair analysts involved comparing the characteristics of hair belonging to a known person with the characteristics of hair belonging to an unknown person.

> Basically if there is one single difference between the unknown hair and the known hair, you can eliminate somebody. In other words, you can say, yes, this hair did not come from that person. The second conclusion is that you have exactly the same characteristics and exactly the same arrangement so that this looks like the same hair.
>
> And the term we use is the unknown is microscopically indistinguishable from the known. You say this unknown hair microscopically matches the hairs of this person, therefore, this hair is consistent with coming from that person.

T. 1241.

Malone explained to the jury that it was extraordinarily rare for two people to have hair with the same characteristics. "This has happened three times in 20 years," he testified. "It was very unusual so I did note it." T. 1241.

13

Malone then turned to the evidence in the case. He testified that on the shoes of Kenneth Ousley, Ferguson's alleged accomplice, he found a blond hair. He explained that this hair "exhibited exactly the same microscopic characteristics as the head hairs of Kelli Hall," the victim. "It was microscopically indistinguishable.  And, therefore, I concluded that the blond head hair coming from the shoes was consistent with coming from Kelli Hall."  T. 1243.  Malone showed the jury pictures of the two hairs, magnified 250 times, to demonstrate that they looked the same. T. 1244. He then reiterated that the two hairs "are microscopically indistinguishable from each other. Therefore, I concluded that this hair from Mr. Ousley's shoes was consistent with coming from Kelli Hall."  T. 1244.

Malone next turned to another piece of evidence, a pubic hair he found on Kelli Hall's socks. T. 1245. He explained that when he compared this hair with a pubic hair taken from Kenneth Ousley, "what I found was that the Negroid pubic hairs from the socks microscopically matched the pubic hairs of Mr. Ousley. In other words, they were microscopically indistinguishable, you could not tell them apart."  T. 1246.  Malone showed the jury pictures of these two hairs as well, also magnified 250 times. T. 1248. "The bottom line," he told the jury, "was that all the characteristics in the Negroid hair from the socks match the characteristics of Mr. Ousley's pubic hairs. Therefore, I concluded that the single Negroid pubic hair from the socks of Kelli Hall was consistent with coming from Mr. Ousley."  T. 1248-49.

The prosecutor carefully encouraged Malone to explain that it would not be likely for pubic hair from two African-American men to share the same characteristics.

> Q. Agent Malone, let me ask you, do all Negroid pubic hairs start narrower and then widen and then widen and narrow, get wider again as that hair did?
>
> A. No. This random pattern, it changes tremendously between different people's hairs.
>
> Q. So you are saying that Negroid pubic hair from someone else could be wider at the base and then narrower and then widen just the opposite of those?
>
> A. That's correct, yes.
>
> Q. And you found these to be indistinguishable?
>
> A. Correct.

T. 1249. Malone summed up his conclusion by stating, "it was a pubic hair that was matched to Mr. Ousley." T. 1255.

At closing argument, the prosecutor emphasized that Malone's expert hair analysis was devastating to the defense theory that the government's informants were lying. Referring to Ferguson, the prosecutor scoffed: "When confronted with them, he goes, just like he said Mel is lying about the gun, Ed is lying.: T. 1528. The prosecutor hammered home the argument that Malone's expert evidence proved that the government's witnesses were telling the truth. "Ladies and gentlemen," the prosecutor declared, "every piece of evidence points to him." T. 1528.

> We know Ousley was with him from 11 o'clock the evening of the 9th all the way through. They take Ousley's shoe. What do they find? They find a treated blond hair. They compare it to Kelli Hall's, indistinguishable. Exactly the same. They are treated the same. He went through the follicles. He went through everything with you. You can't tell them apart.
>
> But there is something further more. And thank goodness they put that white sheet under her when they are rolling that body over with the socks on her feet. They got a negroid pubic hair off of that sock. What do

15

>they–did they match? They matched it with Kenneth Ousley's. They matched it exactly.
>
>And you looked at that chart. Remember how he told they are all different, you know, you got thicker and narrower and colors change. Side by side the colors are identical. The thickness is identical. They change colors at the same time. So, ladies and gentlemen, that's Ousley's pubic hair.

T. 1529.

Michael Malone's false testimony was especially deceptive because of his status as an expert. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 578, 595 (1993) (citation and internal quotation marks omitted). Jurors can judge the credibility of a lay witness for the prosecution, but not the credibility of an expert. The jurors at Jeffrey Ferguson's trial could never have expected that a Special Agent of the FBI, a man with 25 years of experience in the Crime Laboratory, would be telling them something that was not true. The jurors were utterly unequipped to suspect that Malone's testimony, so seemingly scientific, was in fact pseudoscientific nonsense.

Had the jury known that Malone was testifying falsely about his hair analysis, the jury would have accorded much less credibility to the other part of Malone's testimony, about the carpet fiber that supposedly matched a fiber from Ferguson's car. The Justice Department has not declared that Malone testified falsely about the fiber - at least not yet. But a jury that knew Malone's hair testimony was false would scarcely have been inclined to credit his fiber testimony.

A conviction obtained with false testimony "must be set aside if there is any reasonable likelihood that the false testimony could have effected the judgment of the

jury." *Agurs*, 427 U.S. at 103; *see also, Giglio*, 405 U.S. at 154; *Napue*, 360 U.S. at 271. This is an undemanding standard of prejudice that is easily satisfied in this case. Malone's false expert testimony was the one thing that allowed the jury to pull the other circumstantial evidence together and convict Ferguson of the crime. Given the state's evidence, a reasonable likelihood exists that Malone's false testimony could have affected the judgment of the jury. Thus, Ferguson is entitled to habeas relief.

### *Alternative Request for Evidentiary Hearing*

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), a petitioner who "has failed to develop the factual basis of a claim in state court" is not entitled to an evidentiary hearing unless he or she establishes (I) cause for the failure, and (ii) that the hearing will establish his innocence. *See* 28 U.S.C. § 2254(e)(2). The Supreme Court has held that this provision of AEDPA does not bar an evidentiary hearing in federal court where a prisoner exercises due diligence in attempting to develop and present his claims in state court. *Michael Williams v. Taylor*, 529 U.S. 420, 432-37 (2000).

> Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend, as the commonwealth would have it, upon whether those efforts could have been successful.

*Id*. at 435.

"Diligence will require in the usual case that the prisoner at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id*. at 437. Diligence further requires that where the petitioner is on notice of the existence of materiality of certain evidence, that he make reasonable attempts to obtain that evidence.

As stated earlier, § 2254(e)(2) only applies where the failure to develop a claim is attributable to the petitioner. In all other cases, pre-AEDPA law applies, and the decision regarding whether a petitioner is entitled to an evidentiary hearing is governed by *Townsend v. Sain,* 362 U.S. 293 (1963). Under *Townsend*, an evidentiary hearing is required in six circumstances:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

*Townsend*, 362 U.S. at 313. In other circumstances, the federal courts retain discretion to grant or deny a hearing. *Id*. at 312-13. The district court has the power to grant an evidentiary hearing "when applicant for a writ of habeas corpus allege[s] facts which, if proved, would entitle him to relief." *Id*. at 312-13.

### *Section 2254(e)(2) Does Not Apply - Ferguson Diligently Pursued his Napue Claim*

On August 29, 2013, undersigned counsel first received notice from the Department of Justice that Agent Malone gave false testimony at Ferguson's trial. Shortly thereafter, counsel forwarded a copy of the correspondence received from the Department of Justice, including its August 20, 2013 letter to Mr. Robert McCulloch, the St. Louis County Prosecuting Attorney, to state post-conviction counsel. It was state post-conviction counsel who first heard media reports, in late 1996 and early 1997, of an official investigation into wrongdoing in the FBI Crime Laboratory; discovered that Agent Malone was implicated in the investigation for having testified falsely in 1985

18

during the Eleventh Circuit Judicial Counsel's investigation of Judge Alcee Hastings, and pursued a *Brady* claim in state post-conviction proceedings base on the state's failure to disclose favorable impeachment evidence concerning Malone, all to no avail.

The Justice Department letter to Mr. McCulloch requested that he advise the Department of Justice by September 30, 2013, if he intended to take any action based on the information provided in the letter. When that date passed without any action by Mr. McCulloch, the wheels were put in motion for the state to prepare a state petition for writ of habeas corpus to be filed in the Missouri Supreme Court asserting a *Napue* claim - that Ferguson's conviction violated due process because it was based on the knowing use of false testimony.

The state habeas petition was filed on December 24, 2013, at a time when Ferguson did not have an execution date. The Missouri Supreme Court summarily denied Ferguson's petition without an evidentiary hearing on February 21, 2014, the same day it announced that Ferguson's execution was scheduled for March 26, 2014. Undersigned counsel promptly filed his supplemental petition for habeas corpus, eleven (11) days after his *Napue* claim ripened for federal review.

### *Ferguson is Entitled to an Evidentiary Hearing Under Pre-AEDPA Law*

Since Ferguson diligently pursued his *Napue* claim in state court, seeking an evidentiary hearing at the time he filed his state petition for habeas corpus, § 2254(e)(2) does not preclude him from a hearing in federal court. Instead, pre-AEDPA law set out in *Townsend v. Sain*, *supra*, applies and entitles Ferguson to an evidentiary hearing in

19

federal court because the state court did not afford him a full and fair hearing to develop his claim.

WHEREFORE, for each and all of the foregoing reasons, Ferguson prays that this Court grant his supplemental petition for habeas corpus, setting aside his conviction and sentence of death, or alternatively, grant him an evidentiary hearing to develop his *Napue* claim.

Respectfully submitted,

| | |
|---|---|
| /s/ Jennifer Herndon | /s/ Michael J. Gorla |
| JENNIFER HERNDON | MICHAEL J. GORLA |
| 224 N. Hwy, 67, #122 | 555 Washington Avenue, Suite 600 |
| Florissant, Missouri 63031 | St. Louis, Missouri 63101 |
| (314) 831-5531 | (314) 621-1617 |
| (314) 831-5645 - Facsimile | (314) 621-7448 - Facsimile |
| E-mail: jenniferherndon@gmail.com | E-mail: mjgorla@msn.com |

*Counsel for Petitioner*

### CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2014, the foregoing was filed electronically with the Clerk of the Court, to be served by operation of the Court's electronic filing system upon the following:  Mr. Stephen D. Hawke, Assistant Attorney General, P.O. Box 899, Jefferson City, Missouri 65102.

/s/ Michael J. Gorla